UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DEREK D. FINGERS, | ) |
|            Plaintiff, | ) |
| v. | ) No. 2:22-cv-00513-JPH-MJD |
| ROBERT CARTER, JR., | ) |
| JAMES BASINGER, | ) |
| DEANNA DWENGER, | ) |
| AMY EICKMEIER, | ) |
| MARY RUTH SIMS, PsyD, | ) |
| NICOLE KELLY, PsyD, | ) |
| SARAH CLARKE, MHP, | ) |
| MR. VANIHEL, | ) |
|            Defendants. | ) |

**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION**

Indiana prisoner Derek D. Fingers requests a preliminary injunction that would order prison officials to alter his mental health treatment, remove him from segregated housing, and transport him to a mental health hospital. Mr. Fingers has not shown that he is entitled to preliminary injunctive relief, so his motions for preliminary injunction are **DENIED**.

### I. Background

**A. Procedural Background**

The Court screened Mr. Fingers' complaint for viable claims under 28 U.S.C. § 1915A. (Dkt. 16).

Mr. Fingers brings Eighth Amendment damages claims against Dr. Mary Sims, Dr. Nicole Kelly, and Mental Health Practitioner Sarah Clarke ("Medical Defendants"), in their individual capacities, based on allegations that

1

they failed to provide adequate mental health treatment for Mr. Fingers' psychotic disorder from January 2022 to April 2022. (*Id.* at 4).

Mr. Fingers also brings Eighth Amendment injunctive relief claims against Indiana Department of Correction ("IDOC") Commissioner Robert Carter, Deputy Commissioner James Basinger, Wabash Valley Correctional Facility Warden Frank Vanihel, Dr. Deanna Dwenger, and Amy Eikmeier ("State Defendants"), in their official capacities, based on allegations that they purposely adopted a narrow definition of "seriously mentally ill" so that prisoners with genuinely serious mental illnesses may be housed in long-term restrictive status housing despite the known adverse effects this placement will have on their mental health. (*Id.*).

Mr. Fingers then filed a *pro se* motion for preliminary injunction asking "to be removed from the Wabash Valley Correctional Facility 'SHU' restrictive housing unit now renamed the 'SCU.'" (Dkt. 17 at 1). He filed a second *pro se* motion for preliminary injunction asking "this Court to issue a transport order to transport him to a[n] appropriate hospital for medical treatment." (Dkt. 31 at 1).

The Court later recruited attorney Nicholas Lavella to represent Mr. Fingers in this lawsuit through final judgment.[1] (Dkt. 44). Mr. Lavella filed a supplemental brief in support of Mr. Fingers' motion for preliminary injunction. (Dkt. 51). In the supplemental brief, Mr. Fingers asks for "the required medical

---

[1] The Court thanks Mr. Lavella for representing Mr. Fingers at the request of the Court.

2

treatment" and "removal from restrictive housing so that his condition does not deteriorate further." (*Id.* at 3) (cleaned up).

### B. Factual Background

#### 1. IDOC Policy on "Seriously Mentally Ill Offenders"

IDOC Manual of Policy and Procedures dictates how "Seriously Mentally Ill" offenders should be treated. (Dkt. 41-1). If an offender is "Seriously Mentally Ill" but stable, he can be housed in restrictive status housing for up to 30 days if the "Treatment Team determines that the offender's mental health need can be met in restrictive status housing." (*Id.*). Such an offender requires multiple mental health visits with no more than three non-contact days between visits. (*Id.*). If "mental health staff determine that his/her mental health decompensated to the point that remaining in restrictive status housing would cause problems that outweigh the disruption to the offender's mental health caused by the removal," the offender must be removed from restrictive status housing. (*Id.*).

If a seriously mentally ill prisoner "is determined to be stable by the mental health professional, and barring or removing the offender from restrictive status housing would pose a threat to the safety and security of offenders and/or staff the Warden may request an exception to house the offender in restrictive status housing longer than thirty (30) days from the Executive Director of Mental Health and Special Populations." (*Id.*).

IDOC defines "Seriously Mentally Ill" as:

Offenders determined to have a current diagnosis or recent significant history of schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic

3

> disorder, substance-inducted psychotic disorder (excluding intoxication and withdrawal), undifferentiated psychotic disorder, bipolar I or II disorders; offenders diagnosed with any other validated mental illness that is clinically severe, based on evidence based standards, and that results in significant functional impairment; and offenders diagnosed with an intellectual or developmental disability or other cognitive disorder that results in significant functional impairment. For the purpose of this definition, "recent significant history" refers to a diagnosis made at any time in the last 12 months.

(Dkt. 51 at 2-3).[2]

### 2. Mr. Fingers' Criminal and Mental Health History

Mr. Fingers was convicted of Arson, a Class B Felony, and sentenced to 40 years executed at IDOC. *See* https://www.in.gov/apps/indcorrection/ofs/ofs (lasted visited September 21, 2023). His earliest possible release date is September 20, 2033. (*Id.*).

Mr. Fingers' individual therapy records from November 12, 2014, list a diagnosis of Axis I Major Depression (Recurrent Severe), Post-traumatic Stress Disorder, and a History of Substance Abuse. (Dkt. 32-1 at 2). His treatment summary from May 2, 2018, lists a diagnosis of "Unspecified Psychosis, Antisocial Personality disorder, Nondependent alcohol abuse, Unspecified drinking behavior." (*Id.* at 4).

An email from May 2018 includes a "Diagnostic Clarification." (*Id.* at 10). Mr. Fingers was noted to have "Previous Diagnoses" of unspecified psychosis, delusional disorder, antisocial personality disorder, and combinations of drug dependence excluding opioid type. (*Id.*). His "Updated Diagnoses" included

---

[2] Citing https://www.in.gov/idoc/files/02-04-102-DRSH-1-1-2018.pdf (IDOC Policy on Disciplinary Restrictive Status Housing) (last visited September 21, 2023).

episodic mood disorder, antisocial personality disorder, and combinations of drug dependence excluding opioid type. (*Id.*).

This same email listed a diagnosis of psychotic disorder from June 29, 2017. (*Id.*) He had reported sensitivity to vibrations, noises, and light, as well as visualizations of energy sources. (*Id.*). He had presented with loose associations and disorganized thoughts. (*Id.*). The email states that he met with a psychiatrist on July 9, 2017, for a medication management appointment. (*Id.*). At that appointment, he presented as "somewhat tangential for the most part disorganized, linear and goal directed." (*Id.*). His mood was depressed. (*Id.*). He was found to be "impulsive, with minimal ego strength as demonstrated when experiences a narcissistic injury becomes paranoid, irritated, frustrated, makes up stories about staff . . . When he is paranoid he is seemingly quite delusional. It is during these times it is highly suggestive he may well be either embellishing or disassociating as a maladaptive coping strategy." (*Id.*). The psychiatrist prescribed Effexor. (*Id.*).

At a medication management appointment on June 19, 2018, Mr. Fingers reported that his auditory hallucinations had gotten much worse, and he asked for an antipsychotic to help reduce them. (Dkt. 32-4). The treating provider prescribed Risperidone. (*Id.*).

Between April 2018 and January 2019, Mr. Fingers was prescribed Depakote, Risperidone, Effexor, and Risperdal. (Dkt. 32-1 at 18).

### 3. Transfer to Wabash Valley in 2021-22

Mr. Fingers was transferred to Wabash Valley Correctional Facility on December 30, 2021, with a restrictive housing classification. (Dkt. 39-1 at 1-4). When the transfer request was made in May 2021, his disciplinary segregation was set to end in May 2023. (*Id.* at 3). By the time he was transferred in December 2021, his disciplinary segregation had been extended to September 2026 due to additional conduct violations. (*Id.* at 7).

The Report of Inter-Facility Transfer form listed these rationales for transfer:

- Additional Information
- Felony Warrants
- Overall Negative Adjustment
- Recent Negative Adjustment
- Mental Health Needs
- Failure to Adjust
- Other: [illegible]

(*Id.* at 7).

When Mr. Fingers was transferred, Facilities Lead Psychologist Dr. Lamar stated that he "does exhibit signs and symptoms of an Axis I diagnosis but is not at high risk to decompensate if placed in a Secure Confinement Unit." (*Id.* at 3) (redacted).

On January 31, March 2, and March 18, 2022, Mr. Fingers submitted Request for Health Care Forms requesting a transfer out of Wabash Valley or out

6

of segregation. (Dkt. 26-1 at 126, 128, 130). He expressed beliefs that prison officials, judges, and the governor were trying to kill him, beliefs about "a liquid form of magnetic propellant," and beliefs that segregation was exacerbating his mental illness. (*Id.*).

During a March 18, 2022, evaluation by MHP Clarke, Mr. Fingers was observed to have an angry mood and labile affect. (*Id.* at 7). He was described as hostile toward the examiner and manipulative. (*Id.*). MHP Clarke stated that he had a logical thought process with normal content and cognition, insight, and judgment within normal limits. (*Id.* at 7-8).

Dr. Sims then conducted her own evaluation. (*Id.*). She opined, "His presentation at this time does not indicate any psychotic or delusional disorder. His reports of needing protection from the government appears to be an attempt to present himself as delusional." (*Id.*). She opined, "[H]e is placed on strip cell status due to smearing feces on his cell walls after becoming angry with custody staff. This behavior does not appear to be related to the presence of acute or severe mental illness." (*Id.*).

On March 25, 2022, Dr. Sims reported that Mr. Fingers was on a hunger strike and that he had a history of hunger strikes. (*Id.* at 11). When she asked Mr. Fingers why he was on hunger strike, he answered that it was related to his continued placement in segregation. (*Id.* at 10). He referenced legal challenges to segregation based on mental illness. (*Id.*). He stated his belief that in California, mentally ill prisoners are treated at hospitals. (*Id.*). He insisted that his behaviors were related to mental illness. (*Id.*). Dr. Sims opined, "Today his arguments were

7

organized into logical statements. His affect was normal and full-range articulation was good. His though process was good. He did not show any signs of responding to internal stimuli and did not manifest signs of distress. He complained of mental health symptoms but none were manifested." (*Id.*).

A medical record dated March 31, 2022, listed these prescriptions: Benztropine, Risperidone, and Venlafaxine. (*Id.* at 13). An exam note reported that Mr. Fingers accepted food at 6:38 a.m. (*Id.* at 16).

On April 5, 2022, Mr. Fingers had a medication management appointment with a psychiatrist, non-defendant Dr. Steven Bonner. (*Id.* at 17-21). Dr. Bonner observed that Mr. Fingers had a normal affect, made logical arguments, and "has absolutely no signs or symptoms that would be considered diagnostic of Schizophrenia or a psychotic illness. He has normal thought processes and no thought disorder. His sentences are logical and goal directed. He mentions a lot of things in order to sound psychotic, but again has no evidence of [auditory hallucinations] during any of his visits." (*Id.* at 17). Based on these observations, Dr. Bonner opined that Mr. Fingers "has no major mental health issues." (*Id.* at 18). Rather, he "wants to have them so he can be removed from DOC custody and sent to a mental health hospital." (*Id.*). He diagnosed Mr. Fingers with antisocial personality disorder. (*Id.* at 19). He began tapering Mr. Fingers off his antipsychotic medications and recommended a follow-up appointment in two months. (*Id.* at 20).

At the follow-up on May 31, 2022, Dr. Bonner opined as follows:

> [H]e does not have any serious MH (mental health) condition. He tries to convince everyone in MH that he does, but he is absolutely no different in appearance, condition, reports, or speech since last time when his meds were cut significantly.

(*Id.* at 32).

Dr. Bonner concluded that Mr. Fingers was malingering for "secondary gain" to get out of segregation or IDOC. (*Id.*). Dr. Bonner terminated Mr. Fingers' antipsychotic medications. (*Id.* at 34). He set another follow-up appointment for two months. (*Id.*).

On July 12, 2022, Mr. Fingers had an appointment with Dr. Sims, and she characterized him as "demanding" and "manipulative" toward her. (*Id.* at 44).

On July 29, 2022, he had another follow-up appointment with Dr. Bonner. (*Id.* at 46). Dr. Bonner observed that while Mr. Fingers talked about government officials sending "beams" into his cell, "He says all of this in a very matter of fact fashion, as if a recitation. He voices anger at it, but does not report any actual physical concern for himself – which is atypical." (*Id.*).

Dr. Bonner concluded that Mr. Fingers' behavior,

> indicates the report is more for effect than an actual delusion. If he were delusional and believed that he would focus on the harm it was doing him and be asking for help for this harm. He voices none of this. In addition, he has a normal affect and no negative symptoms. Furthermore, he has no formal thought disorder. All of his speech, while angry, is totally relevant, goal directed, and linear. He has no thought blocking, no ideas of reference, no other evidence of psychotic thinking.

(*Id.*).

Mr. Fingers had been off all antipsychotic medication for seven weeks, and Dr. Bonner did not observe any difference in his thoughts, behaviors, or actions.

9

(*Id.* at 47). He again concluded that Mr. Fingers was feigning mental illness to get out of segregation or IDOC. (*Id.*).

Mr. Fingers went on hunger strike in September and October 2022, and February 2023. (*Id.* at 50-66, 72-81). Each time, he was treated by the medical and mental health staff. He reported in a court filing that he was on hunger strike in February 2023. (Dkt. 31 at 1-2).

### 4. Mr. Fingers' Disciplinary History at Wabash Valley

During his time at Wabash Valley Correctional Facility, Mr. Fingers had five disciplinary violations resulting in an additional 9 months of segregation. (Dkt. 39-2).

On March 17, 2022, a correctional officer witnessed Mr. Fingers' cell with feces spread all over the walls. Mr. Fingers was found guilty of the offense of Body Fluid and Fecal Waste, and received an additional three months of disciplinary segregation, making his release date from disciplinary segregation December 28, 2026. (Dkt. 39-2 at 26-31).

On March 22, 2022, Mr. Fingers covered the camera in his cell. He did not uncover the camera until a correctional sergeant entered the range and ordered him to uncover the camera in front of the cell. Mr. Fingers was later found guilty of Impairment of Surveillance. He did not receive additional disciplinary segregation for this offense. (*Id.* at 18-25.).

Later the same day, Mr. Fingers was removed from his cell to be placed on strip cell status for covering his camera. Upon further inspection, it appeared that Mr. Fingers had spread his fecal waste across his floor. He was later found

10

guilty of the offense Body Fluid & Fecal Waste, and received another three months of disciplinary segregation, making his new release date March 28, 2027. (*Id.* at 11-24).

On August 4, 2022, Mr. Fingers attempted to cut a correctional officer with a razor blade concealed in his hand while the officer was collecting lunch trays. Mr. Fingers was found guilty of Conspiracy/Attempt/Aiding in Assault on Staff and received another three months of disciplinary segregation, making his new release date from disciplinary segregation June 28, 2027. (*Id.* at 5-10).

On August 10, 2022, Mr. Fingers threatened a correctional officer, and was later found guilty of another disciplinary offense. He did not receive additional disciplinary segregation for this offense. (*Id.* at 1-4).

## II. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015).

As a threshold matter, "a party seeking a preliminary injunction must satisfy three requirements." *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018) (internal quotations omitted)). It must show that: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.*

If these threshold factors are met, the court proceeds to "a balancing phase," where it "must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). In the final analysis, the court equitably weighs these factors together, seeking at all times to "minimize the costs of being mistaken." *Id.* (internal quotations omitted).

### III. Discussion

**A. Likelihood of Success on the Merits**

Mr. Fingers seeks injunctive relief that would remove him from Wabash Valley's restrictive housing unit, (dkt. 17 at 1), and transfer him to a hospital for treatment, (dkt. 31 at 4). The claim for injunctive relief allowed to proceed in the screening order, however, was based on allegations that the State Defendants have conspired to narrow IDOC's definition of "seriously mentally ill." (Dkt. 16 at 4). This narrow definition was allegedly implemented so that prisoners with genuinely serious mental illnesses, such as Mr. Fingers, can be kept in restrictive status housing despite the adverse effects on inmates' mental health. (*Id.*).

Mr. Fingers does not argue that he has shown a likelihood of success on that claim, (dkt. 51 at 10–12), and the evidence designated in connection with the preliminary injunction motions directly contradicts it. The current IDOC definition of "seriously mentally ill" is not limited to prisoners with brain damage. *Supra* at 4. Instead, it encompasses several disorders, including various

psychotic disorders and "any other validated mental illness that is clinically severe." *Id.* The allegations against the State defendants with respect to the definition of "serious mental illness" are therefore not, at least at this stage, supported by the evidence. Nor is there any designated evidence that the State Defendants, or any official employed by IDOC, dictated Mr. Fingers' mental health diagnoses. Instead, those decisions were based on the conclusions of Dr. Sims and non-defendant Dr. Steven Bonner—both of whom are employed by a private medical provider. (Dkt. 26-1 at 7-11, 17-21, 32-34, 46-47).

Without a likelihood of success on the merits, this claim cannot support injunctive relief. *See Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) ("[A] plaintiff must demonstrate that its claim has some likelihood of success on the merits.").

Mr. Fingers argues, however, that he has shown a likelihood of success on the merits because the defendants are deliberately indifferent to the effect that continued disciplinary segregation will have on his mental health. (*See* dkt. 51 at 10–13.). This argument has only a low chance of success. Multiple mental health practitioners evaluated Mr. Fingers over several months and determined that his behaviors and professed symptoms were inconsistent with a psychotic disorder. He presents no evidence supporting an inference that these determinations were not based on professional medical judgment. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment."); *see also Johnson v.*

13

*Obaisi*, 2023 WL 5950125 *2 (7th Cir. Sept. 13, 2023) ("a doctor's sincere belief that an inmate was malingering does not support an inference of deliberate indifference to the prisoner's medical needs") (citing *Townsend v. Cooper*, 795 F.3d 678, 690 (7th Cir. 2014)).

However, Mr. Fingers has past psychiatric diagnoses and a recent history of self-harm. (*See* dkt. 32-1 at 2–3; dkt. 26-1 at 58–63). And because he had been diagnosed with malingering, Mr. Fingers was not receiving antipsychotic medications. (Dkt. 26-1 at 32–34). While it is unlikely that Mr. Fingers will be able to show that those decisions were not an exercise of professional judgment, there may be some likelihood of success on the merits and the Court will consider the remaining preliminary injunction factors. *See Cassell*, 990 F.3d at 545.

### B. Irreparable Harm and Adequate Legal Remedies

Mr. Fingers argues that without preliminary injunctive relief, he would suffer irreparable harm that cannot be remedied because being in segregation with his mental illnesses causes severe self-harm, including hunger strikes. (Dkt. 51 at 12–15). The State Defendants respond that it's speculative whether being in segregation causes Mr. Fingers' harm. (Dkt. 55 at 16–17). Mr. Fingers, however, has provided evidence of his self-harm, and of his consistent belief that segregation exacerbates his mental illness. (Dkt. 26-1 at 126, 128, 130). Moreover, IDOC policies on serious mental illness recognize that remaining in segregation or restricted housing can "cause problems" to mental health. (Dkt. 41-1). The Court will therefore balance the preliminary injunction factors. *See Cassell*, 990 F.3d at 545.

14

### C. Balancing

On balance, Mr. Fingers has not shown that he's entitled to the preliminary injunction he seeks. As explained above, he has a low likelihood of success in showing that medical professionals did not act in their professional judgment. With a low likelihood of success, the balance of harms would have to weigh decisively in his favor. *See Mays*, 974 F.3d at 818 ("[T]he more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa.").

Here, the IDOC would suffer substantial harm from a preliminary injunction requiring it to transfer Mr. Fingers from segregation. Mr. Fingers has a long history of disciplinary violations and violent behavior. He has recently spread feces in his cell more than once, covered the camera in his cell, threatened a correctional officer, and attempted to cut a correctional officer with a razor blade. (Dkt. 39-2 at 1-31). He's also attempted to harm himself several times and either suffers from serious mental illness (by his account) or is malingering (by the medical providers' account). In fact, because prison safety and security are at stake here, the requirement that Courts defer to prison officials weighs particularly heavily. *See Mays*, 974 F.3d at 820 (holding that district court erred in granting preliminary injunction by failing to defer to correctional administrators in a matter implicating safety and security concerns: "When evaluating reasonableness courts must afford prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional security.") (cleaned up); *Scarver v. Litscher*, 434 F.3d 972, 976-77 (7th Cir. 2006) ("Prison authorities must be given considerable latitude in the design of measures for controlling [violent prisoners] beyond what is necessary for security. It is a difficult balance."); *Garza v. Miller*, 688 F.2d 480, 488 (7th Cir. 1982) (Facility transfers, security classifications, and bed placements are generally left to the administrative expertise and discretion of prison and jail officials.).

Moreover, the Prison Litigation Reform Act ("PLRA") "constrains a court's authority to enter an injunction with respect to prison conditions: 'The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022) (quoting 18 U.S.C. § 3626(a)(1)(A)). Here, even if Defendants were deliberately indifferent to Mr. Fingers' mental health needs, Mr. Fingers has not argued or designated evidence that transfer from segregation would be the narrowest or "least intrusive means" to correct that violation. (*See* dkt. 51 at 13–15.). Ordering that specific remedy would therefore violate the PLRA. *See Rasho*, 22 F.4th at 713 ("[P]laintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury."). And it would "impermissibly strip[ ] IDOC officials of the of the flexibility necessary to adopt and implement policies that balance prison resources, safety concerns, and inmate health." *Id.*

16

Mr. Fingers therefore has not shown that, on balance, he's entitled to a preliminary injunction.

### IV. Conclusion

For the reasons set forth above, Mr. Fingers' motions for preliminary injunction, dkts. [17] and [31], are **DENIED**.

**SO ORDERED**.

Date: 9/28/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

DEREK D. FINGERS
951762
WABASH VALLEY – CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel